Good morning. The Honorable the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the court is now sitting. God save the United States and this Honorable Court. Good morning. Mr. Simmerman, when you're ready. Yes, judges. Good morning. May it please the court. Frank Trey Simmerman, counsel for the McArdle Family Partnership. And I see the shot clock is right. I'd like to reserve seven minutes for rebuttal. Briefly to roadmap, I'll do a brief factual presentation, then we'll get to the district court's errors. Initially, I'd submit this is a matter of substantial importance for the state of West Virginia and oil and gas jurisprudence, because if the district court's ruling is upheld, it will substantially disrupt royalty practices and mineral ownership practices within the state. This matter arose because after eight years of oil and gas production by Antero, without any payment to the McArdle Family Partnership, MFP received a one-sixteenth royalty check from Antero that was unannounced with 500 pages of documentation and evidence that the estate had been produced and monetized from 2012 to 2020. So to speak, the check just arrived. First and foremost, an overriding royalty is a royalty paid out of oil and gas production. It's typically created when an operator upsells assets or when services are performed by a third party. Following receipt of the check, MFP questioned Antero about how the payment was calculated, how many acres were included within the check, was it right or was it wrong, and clear answers were not received. That's within the joint appendix at pages 78 to 83. And why is that important? Because a decimal interest in a well demonstrates how many owned mineral acres are being produced. There's a basic formula. You take the number of acres in production, you back that into the entirety of the drilling unit of the production, you multiply that by the and that gives you your percentage of the well, so to speak, how you are being paid, what is being produced, and what is not being produced. Specifically here, MFP asked, among other questions, the Hudson lease totals 490 acres. I'm only being paid on 266.9 acres. How is this explained? That's within the joint appendix at page 72. If we step back in time, in the 1960s, a number of wells were drilled in West Virginia as part of a drilling program. Those included the Hudson, the Toner, and the Stone leasehold estates. They were shallow wells. They were drilled to about 2,500 feet in a formation known as the Big Engine Formation in North Central West Virginia. They were not Marcellus shale wells. They were not what we would call deep shallow wells. They were thousands of feet from that mineral formation. There are a number of undisputed items in this record. I'm going to briefly walk the court through them. It's undisputed that MFP's predecessor in title was part of a team that raised money and sold these fractured interest in oil and gas wells in North Central West Virginia. Some of the shares remain outstanding to this day. It's undisputed that the assets that were produced and acquired were the Hudson acreage, which totals 490 mineral leasehold acres, the Toner acreage, which totals 34 acres, and the Stone acreage, which totals 97 mineral acres in North Central West Virginia. It's undisputed that these assets have been held by production from these drilling programs in the 1960s to present. There are also some critical undisputed elements for the court. It's undisputed that in 1996, the day of the assignment which brings us here this morning, MFP's direct predecessor had acquired and placed a record overriding royalty interest in Daughters County, West Virginia. These were fully disclosed to Key Oil, the assignee within the 1996 assignment agreement which brings us here this morning. MFP's predecessor disclosed a 116th override in the entirety. Can I counsel? Sorry, I imagine my colleagues have too. We've read the brief. Can you actually get to the question of why you think the 1996 assignment did not include all of James Drilling's interests? The district court said all means all. I understand you to say all means everything included in Exhibit A. Sim, I agree with that statement. You have the paragraph two argument. You're happy to make that one but at least focus on this second part. I understand the paragraph two argument as well but how about just focus on this piece. Why do you think particularly described in Exhibit A is a limitation on the word all? Yes, certainly Judge Richardson. If you look within Exhibit A which is incorporated within the body of the 1996 assignment agreement, it's plainly binding on successors and assigned and Exhibit A is a very specific description of wells and interest. If we go to the document itself, you have to break the language down piece by piece like a math equation. For example, on the Hudson interest, Exhibit A has a footnote which is binding within the document and it describes specific parts of the oil and gas leasehold estates which are that's in the note section within Exhibit A and those parts are all that certain 40 acre portion portion limiting language 40 acres limiting language upon which a well was drilled and we've given the court the depths of the wells in 1996 that they were shallow. Thus, these are limited assignments or conveyances by the express terms of the 1996 assignment agreement. All right, so I understand the first part of your argument is that Exhibit A limits what's transferred. I don't understand the second part of that which is that out of read paragraph one to not refer to the entire 40 acre provision there but instead only a part of that 40 acre provision. Certainly. Help me understand how I make that move. Why is upon which a well known was drilled? Why that is a limitation rather than a description? It's a limitation because in 1996 these wells have specific depths and if you look further below in Exhibit A. No, no but that but so that doesn't that doesn't really like help me a whole lot right because I'm trying to read the language to limit the 40 acre portion to the well that was drilled on it. Okay, well the language help me understand that first piece. I understand you have a separate argument that paragraph six does something for you but can you just help me with like paragraph one that is a particular 40 acre portion and it seems to be part of your argument is that well no it's not the whole 40 acre portion that's described in paragraph one it's really only this Hudson well number one. Help me understand from an English perspective why I would read paragraph one that way. Sure and it's a it's a borehole assignment it's all it is and it ties into the body of the assignment as well. Okay but when you say a borehole assignment I understand that's your lingo but what I don't see is how I I don't see borehole assignment in paragraph one. I don't see any reference to boreholes right what I see is a description of a 40 acre chunk. Upon which a well was drilled. Yeah and that is a also say upon which the big white house stands right or upon which you know the the biggest pecan tree in the county sits right. Okay that's like a helpful description to understand which 40 acre portion we're referring to but why is that a limitation? Yeah Judge Richardson I agree with you and if the document said upon which a white the white house sits plus or minus a thousand feet which is what this assignment agreement says in exhibit a within a thousand feet of any presently existing well upon either of the aforesaid leases is what the assignment says further down in the body and I think that's what the court is missing. You drill a well a well was drilled plus a thousand feet it's a buffer concept it's a borehole plus a buffer of a thousand feet up down sideways and no matter how you construe that thousand feet and tarot the respondents lose this argument because the Marcellus shale formation sits approximately four thousand feet below the wells as they were drilled in 1996. Page 10 of our reply brief addresses this very specifically with a chart which demonstrates how this 1996 limited assignment operates and I don't want to stray from the court's question but the court is reading exhibit a without reference to the body and the document must be construed as a whole if we start in the preface there are three except as here and after provided those are that's limiting language which you couple with the limitations in exhibit a Can I ask one more question and then I'll let my colleagues sorry I don't mean to monopolize but if I disagree with you and so if I read paragraph one through five as referring to the entirety of those 40 acres are you making an argument that you also have this sort of separate 164th net profit interest on other pieces that were not transferred to Hott in 78 or is your whole argument that we've got to read one through five only as to the well itself? There's a separate independent basis a very clear basis for why these overrides remain valid and that's because from 1941 to present in West Virginia and from the Bankers Pocahontas case a covenant to pay royalties is a valid exception the form of the exception is immaterial further these profits and royalty interest were actually it's not like we're dealing with inquiry notice constructive notice key oil in 1996 had actual knowledge of the existence of these royalty and profits interest and they signed a contract as an assignee which states in section 2 that the assignee covenants and agrees to comply with the terms and conditions of the oil and gas leases in exhibit a including but not limited to payment of all net profits payments royalty and overriding as defined in the leases from our perspective that language is crystalline and that is what the district court failed to give any meaning to but that's the only I just I just want to make sure I think you have another argument but I'm not sure you're making it so I just want to make sure I understand so again to restate if I disagree with what you've just said right that this is limited that one through five is limited to the well are you making any other argument such that if I if I said no it's not limited to the wells that there's another piece of 164th net profit interest in portions of that were not transferred to hot that that you have a that you actually were able to acquire is that part of your argument or not our argument is that the hot you can take the hot our argument is that the hot transaction isn't an issue here those are valid they're in pay by interro the claims here relate to the entirety of the Hudson the towner and the stone lease and that's what the language states and that the entirety of this 1996 assignment agreement is limited in its very nature from the descriptions and that's consistent with cases which have been may I finish with cases that have previously been before this court and arguments which antero has previously presented to this court in mountaineer minerals which are all in the appendix record in this matter just rushing you to my time person all right thank you counsel miss smith yep thank you your honor my name is amy smith and i'm here on behalf of the defendants and appellees in this action antero resources corporation key oil corporation and frank butler your honors i'd like to step back just one second to what's really at issue here because one thing that mr zimmerman never mentioned in his argument is the may 2008 assignment from james drilling by which mfp claims its interests also like the court to look now that document is that ja60 and at ja60 that document only purports to assign a 1 64th of gross income override to with regard to the two hudson leases the towner lease and the stone lease there's no 132nd of towner and stone as alleged in the complaint count two and there's no 164th net profits interest in the hudson as alleged in count two and there's no 116th interest in by net profits interest in the hudson leases as is the place where mr started his argument before the court today count two of the second amended complaint which is at ja130 very clearly sets forth a claim well not very clearly but it does attempt to set forth a claim of a 132nd interest in the town or town and stoner or counter and stone leases and a 164th net profits interest in the hudson leases those references to book and page number in count two are references to prior uh assignments of those leases in 1960 long before any assignment was purported to go into mfp those are irrelevant and mfp can claim no interest based on what its predecessors had it's true he can only get what his predecessors had give but he doesn't get everything that someone had in 1960 now mr zimmerman mentioned the 116th override in the hudson lease that was conveyed that's an issue by the way your honors one of this case this is an appeal based on a certification under rule 54b of the district court's judgment with regard to count two and count two alone in this case the 116th interest is at issue and currently being litigated in count one for some reason um the conclusion in mr zimmerman's brief uh does request a declaration regarding the 116th interest that's improper it's not before the court in count two there's no question about that the february 2008 assignment uh count counsel can i can i ask you the version of the same question i asked your colleague i understand that you likely agree with the district court that all in the 1996 agreement means all without limitation um but assume hypothetically for a minute that that i disagreed with that um and i thought the 1996 agreement was limited to that which was included in exhibit a all right just accept that as a hypothetical i know you disagree with it but accept it for a minute um and then accept that i read exhibit a with respect to the hudson lease um to set forth 5 40 acre tracks in their entirety um as well as uh within a thousand feet of existing wells right which was basically the the 78 transfer to hot if i agree if that was the sort of legal conclusion obviously that's different than what the district court concluded um would there have been something left for the 2008 transfer and in particular what i'm thinking about is the the portion that uh hardberger transferred to james drilling in 1990 is that 164th um net profit interest in portions of the hudson property it's not all of it but it's it was that retained if i if i read the lease that way or or does that or do we not really know the answer to that because the district court just didn't get to that issue your honor if i understand your question it's a hard one i acknowledge i i don't think that either the district court or the defendants uh would disagree with what i understood your reading to be of exhibit a because exhibit a is limited although to clarify exhibit a has the entire leasehold interest regarding those 40 acre tracks in the first five um numbered paragraphs of the second page of exhibit a it's very clear from that that it says the specific parts of the oil and gas leasehold estates created by the oil and gas leases described in number six and seven above which is the hudson leases and it says which are assigned by operation of the assignment agreement are as follows and your honor made a good point when it said upon which a well known as cp hudson well number one two three four that is merely descriptive it's not limiting that conveyance to a wellbore assignment it's only describing that there happens to be a well there and with regard to number six that's not a depth limitation that's an acknowledgment that in the interim there may very well have been additional wells drilled and with regard to those wells drilled that they also they being in this instance key oil obtained all of the leasehold interests within a thousand feet of any additional well because as your honor noted this language started to come into the lease assignments way back in 1978 at least and this is the exact language it from the 78 hawk transfer i believe you're right your honor yes so so six would encompass whatever wells have been drilled between 78 and 96 yes your honor it's additional wells it's no indication of a wellbore or depth limitation but but so just help help me maybe try to understand this but when the hawk transfer was made in 78 um my understanding is there were this was what was included but there were other things that were excluded um from that from that transfer right and that was the the portion that hardberger had and that portion was then returned to james drilling in 1990 which means james drilling had it in 96 but it's not included on this list in exhibit a well there are other interests in other in other leases your honor yes yeah but this is one this is in hudson it's a 164th net profit interest in hudson right it it went from shearer to hardberger in 61 and then um hardberger gave part of it to rawlings in 64 and then he kept 164th and he gave that to james drilling gave transferred to james drilling in 1990 and and that is part of the conveyance because the part of which conveyance the 96 conveyance yes your honor it's part why tell me why i don't understand that at all oh absolutely your honor because the recital and the granting clause in the 1996 conveyance to key oil very expressly grants all let me see um it says all of their right title and interest in into those certain oil and gas lease and that would be one of those no no no no okay but uh but it says as more particularly described in exhibit a and and we've just established that what the the interest that i'm describing for what i'll call hardberger's 164th is not included in exhibit a it's not in one two three four or five or six your honor hudson lease your honor those are references to the original lease and all portions of the original lease were in um james drilling in 1990 that is something that's been agreed to by the parties and uh the court noted it the district court noted it in its opinion yes the the references to the hudson leases in the first page of exhibit a are general references to the original lease and the date of the lease and those 164 net profit interests were conveyed back to james drilling by in 1990 and they would go to did go to key oil in 1996 but but just just help me real quick and i'll i'll then stop but do you agree that it's not um included in the six numbered paragraphs of the 1996 agreement that 164th interest that hardberger had that james you only got in 1990 it's not included in those six paragraphs right like all of the interests were are included in those six paragraphs meaning and this goes i think why is that we've got i mean that we have 540 40 acre parcels i'm not a math major but that doesn't equal all of the hudson lease right the hudson lease is 490 maybe right yeah and that's and so we've identified 200 of 490 i understand that to be 200 to be less than 49 but with within the 200 the 164th net profits interest is included outside and that's the only portion these so when in the assignment to key oil in 1996 it's not the 400 or so acres of the hudson leases it's these this acreage but within the acreage that is described in exhibit a all of james drilling's interests were and sheer's interests were conveyed to key oil and that includes all of the overriding the working interests the overriding interest profit what i believe the disconnect is here is that there is residue the other 200 or so acres of the hudson leases that's not part of the conveyance to key oil and is not at issue in count to maybe since on this on this subject here and this is a inquiry help me with this j5 42 43 it seems like it suggested there's a limitation about your expectations of profits and it seems like it's almost acknowledging something you may not have purchased can you help me with those two pages j it's an informal document it's not in a sense but it's and i don't know it may just suggest but can you help me with that 5 43 5 4 5 42 5 43 yes your honor i'm looking at those pages now and and i believe you know what that indicates is that there is a an override in james drilling that would be assigned by virtue of assignment of all of james drilling's interests it looks like there's also an outstanding override that could be an in a third party which goes to paragraph number two that was not really addressed in full perhaps in mr zimmerman's argument but really the only argument regarding any limitation of the transfer of the overrides that that mr zimmerman has is by virtue of misconstruing the terms and conditions in paragraph two of the terms and conditions of the 1996 leasehold assignment to key into key oil that numbered paragraph two indicates that that um key oil agrees that it will pay net profits payments nets profits payments royalty and overriding royalty as defined in the leases or any assignments uh heretofore disclosed to assignee that is third party overriding royal risk mr zimmerman said that the court did not address that in fact the district court did address it in the district court agreed with that reading of it that it's a third party royalty override net profits interest that key oil is agreed to pay and there are in fact the court identified there are some of those extra third party uh overriding royalties or royalties or any other types of interests that make that paragraph not superfluous and so that's what that means this is simply a working paper your honor um that was produced by key oil and discovery honestly no one was deposed about what these working papers from their due diligence actually mean but mr zimmerman makes the point that they that key oil knew about the overrides of course key oil knew about the overrides held by james drilling they were transferred to key oil when all means all in the granting clause all of its right title and interest to these leasehold estates that includes the working interest the what the overriding royalty interest the net profit interest all of the interests held by james drilling at the time of the transfer which the parties have agreed and the court has below include all of these interests possibly claimed by mfp even though mfp keeps changing its mind about what these interests are now the other thing that i'd like to um i'd like to address mr zimmerman uh pointed to the mountaineer minerals case the language the granting language in the mountaineer minerals case is clearly distinguishable from the granting language involved in this case in the mountaineer mineral case the grant was in and to the following oil and or gas wells and any and all leasehold rights associated there with uh your honor judge gregory i believe you were on the panel in mountaineer minerals that held that that was a wellbore assignment that's not what we have here what we have here your honor is like the blackshear lease in the trans energy versus eqd eqt production case uh which is 743 f third 895 that's a four circuit case uh where i believe judge gregory you wrote the opinion uh in 2014 and in that case it involved the blackshear lease and there was an argument made that the blackshear lease was limited to oil because a list of a list of wells one of them was an oil well the court held no this was an assignment of both leases and wells and it was not limited to oil it was all interests that's what this case is and may i continue yes you may and the judgment of the district court that held that mft could not establish even the first element of a breach of contract claim because it did not own the interest that it claims in the toner stone and hudson leases um alleged in count two it doesn't own them it can't establish a breach of contract thank you your honor thank you counsel mr simmering you have some time is there yes judge um maybe it's seven minutes left yeah so yeah miss smith and i can certainly agree upon something the word all does mean all and in paragraph two the word all has to mean all it doesn't say third party overriding royalties third party net profit interest it says all royalty revenue profits interest the foundation for part of antera's argument is contrary to the record in this case the mccardle family partnership was assigned the 16th in the hot as well as the other 16 32nd 64th and 16th in all the hudson there are two assignments in this record not one as suggested by antera book 222 page 393 book 222 page 395 one is a conveyance of the 16th outside of the 40 the other is the 16th all of the hudson that's in the record antero's argument on that point falls flat i want to briefly discuss morris or pardon me mountaineer minerals it was argued and i can i just ask you you brought this up and i i can't figure out what this is really talking about in the um 222 392 assignment um on the second page of it the second paragraph the second sentence it says the aforesaid leeches referring to the two hudson leases lack the overriding royalty to 5 40 acre tracts or parcels which were assigned in previous assignments correct and then if you look at those are those are the 5 40 acre parcels that are listed in the 1996 assignment paragraphs one two three four and five correct that's correct and then there's a separate assignment in this record at 222 395 which is an assignment of all the overriding royalty interest in the hudson towner and stone acreage in the 490 the 97 and the 34 so there are two assignments into he's clearly but but the the point is in the february 2008 there's a recognition that there's in the hudson james drilling has this these 5 40 acre pieces and then it has a remainder right some acres 290 ish maybe i don't know some some number like that that it also has an interest in and that's what the february 2008 lease sort of is acknowledging to the two assignments acknowledge the title split that the overrides on one side went on this side and the overrides went on the other side and what mr mccardle was doing was cleaning up the files and he then merged both of them into the mccardle family partnership because he had to based on how the in all of the acreage so the record is clear there i'd like to turn briefly to mountaineer minerals it was up on the to the fourth circuit may 29th 2019 opinion back down september 12th 2019 northern district of west virginia on remand and in that case antero argued that all the indications and all of the limitations in the 1996 assignment today were in fact limiting language and judge stamp relied upon the same indicia the same evidence to conclude that a 1996 assignment agreement in west virginia involving antero and key oil was in fact a limited assignment and the court looked at like we have in our 1996 assignment the fact the plugging liability was went to the assignee the fact that the pump jack there were references to well materials and well went to the assignee and the court also looked at the royalty covenant in that case to determine that it was a limited wellbore assignment and that's all reflected in mountaineer minerals it's a northern district of west virginia 116 cb 228 decision on pages 9 12 15 and 16. this case isn't anything like the trans energy case to address that point the trans energy exhibit was not limited in any way shape or form the way i read that opinion there was a box where there was a check for oil or gas and that's what the court looked at here we have limiting language on the face of the assignment which was not given any consideration by the district court in its opinion and all does mean all i haven't really touched on merger and that's intentional because the court didn't make any real findings at the district court level about the doctrine of merger i do want to talk briefly about one case cited in our brief it's the page decision it's a colorado case and it really evidences what antero and key are trying to do here they're trying to receive the benefit or benefits of the 1996 assignment agreement and shirk the burdens so that they can maximize their revenue interest in this production and not pay the mccardle family partnership based on the clarity of the 1996 assignment agreement what they're trying to do is to expand their interest in the wells by cutting out the mccardle family partnership and it's clearly of record overriding royalty interest in the entirety of the hudson the towner and the stone acreage now i think the court judge richardson asked a question earlier which i think speaks deserves some comment the hudson reservation or exception of the deep rights it's more specific than the towner and the stone because of the as drilled limitations the thousand foot limitation and the note that all that was conveyed in 1996 as to hudson were specific parts of the oil and gas leasehold estate which are assigned as follows a portion as drilled not the entirety of the state it never touched the marcellus shale in 1996 and this transaction reflects that and it's not just one place that talks about payment of royalties net profits and revenue it's multiple places in the assignments in paragraph two it's in paragraph four and it was agreed and understood that these were to run with the land that's what the document says and key oil knew that all meant all the assignee included that language in this document in 1996 we respectfully submit the district court aired and the opinion should be reversed the language should be given a fair reading and i've overrun my time my shot clocks up i think both counsel and
judges: Roger L. Gregory, Julius N. Richardson, Allison J. Rushing